{¶ 1} Robert Spickler ("Appellant-Father") appeals the judgment of the Columbiana County Court of Common Pleas which granted Penny Spickler's ("Appellee-Mother") motion to modify the court's previous child support order. Appellee-Mother has filed a cross-appeal from that decision wherein she challenges the trial court's valuation of Appellant-Father's income for purposes of calculating support. Based on the record herein, we affirm the decision of the trial court, but must modify the court's calculation of Appellant-Father's income so that it complies with the requirements established under R.C. 3119.05(D).
 {¶ 2} The parties divorced on April 9, 2000. After some litigation the parties agreed to share custody of their three children. The court approved a separation agreement and shared parenting plan and attached it to the divorce decree.
 {¶ 3} On January 16, 2001, Appellee-Mother asked the trial court to increase her child support. She also requested that the court reallocate one or more of the tax exemptions for the couple's children, all three of which the court originally awarded to Appellant-Father. Appellee-Mother maintained that the $213 per child that she was receiving in monthly child support was insufficient. She also sought to claim at least one of the children as a dependent on her tax returns in light of her current income and employment situation.
 {¶ 4} Appellant-Father's sole response was to file a motion seeking contempt against Appellee-Mother, arguing that in filing her motion she violated the parties' agreement to mediate any dispute before pursuing a remedy in court. According to Appellant-Father, mediation was required in section "M" of the Shared Parenting Plan, which states as follows:
 {¶ 5} "Any disagreement between the parties respecting any decision affecting the child, or about the interpretation of this Agreement or about the modification of this Agreement will be resolved by mediation before taking legal action. Expenses for such mediation or legal action, not including attorney fees, will be shared equally by the parties."
 {¶ 6} The magistrate denied Appellant-Father's motion for contempt and refused to send the matter to mediation. (May 2, 2001, Tr. p. 4).
 {¶ 7} During the hearing on Appellee-Mother's motion to modify child support, she explained how her circumstances had changed in the year following the divorce. Appellee-Mother had completed her schooling and found full-time employment as a software engineer. She now earned $35,000 annually but traveled an hour each way to reach her job at CTR Systems in Wexford, Pennsylvania. (May 2, 2001, Tr. pp. 7-10).
 {¶ 8} Appellee-Mother testified that during the workweek her two older children spent most of the day in school and then attend an after-school care program at "Imagine That," a daycare center conveniently located close to her home in Columbiana, Ohio. The youngest child routinely spent the entire day at the center's nursery school. Occasionally, depending on Appellee-Mother's work schedule, the children also attended the center's before-school care program. (May 2, 2001, Tr. p. 13).
 {¶ 9} The record reflects that the financial strain resulting from Appellee-Mother's altered employment situation was substantial. During the school year, Appellee-Mother's childcare expenses amounted to approximately $816.80 each month for all three children. (May 2, 2001, Tr. pp. 14-15). Appellee-Mother projected that the cost of sending the three children to summer camp at "Imagine That" would total approximately $896 per month. (May 2, 2001, Tr. pp. 15-17). Notwithstanding the substantial expense involved, Appellee-Mother stressed that the center's program was excellent, its location was beneficial for the family, the children appeared to thrive in it, and she was reluctant to transfer them elsewhere. (May 2, 2001, pp. 17-19, 55).
 {¶ 10} Appellee-Mother could not afford, however, to continue enrolling the children in this program without additional financial assistance. She sought the increase in child support payments to cover the shortfall. Appellee-Mother maintained that, with an annual income of somewhere between $67,000 and $72,000, Appellant-Father could absorb a major portion of this expense. (May 2, 2001, pp. 61-62). Appellee-Mother acknowledged that less expensive childcare alternatives existed. She was aware, for example, that Appellant-Father wanted to hire a fifteen-year-old neighbor to watch the children over the summer. Appellant-Mother testified that she was hesitant to leave her three children with the teenager for extended periods of time because she feared the teenager lacked the maturity and training necessary for such a challenge. (May 2, 2001, Tr. pp. 53-55).
 {¶ 11} Appellant-Father opposed any increase. At the hearing on Appellee-Mother's motion, Appellant-Father maintained that his salary was actually $4800.00 less than the amount reflected on his W2 forms because a substantial part of his salary was intended to cover the cost of and expenses associated with his company car. Moreover, Appellant-Father complained that an unexpected increase in gasoline prices had drained some of his profits. (May 2, 2001, Tr. pp. 71-73).
 {¶ 12} Appellant-Father also pointed out that he had incurred an array of necessary but unexpected expenses related to his employment that the court was required to consider before assessing any increase in child support. Appellant-Father complained about expenditures for gasoline for his daily twenty-four mile commute. Appellant-Father stated that, as a mechanic, he had to purchase and maintain his own complete set of tools.
 {¶ 13} Appellant-Father testified that he had been forced to borrow $10,000.00 from a friend to avoid bankruptcy (impliedly due to the divorce) and he needed to make monthly payments on that debt in the amount of $500. He conceded, however, that he had not yet begun paying this particular debt, anticipating that he would start soon. (May 2, 2001, Tr. pp. 80). Appellant-Father also testified that he paid an additional $80 each month to babysitters for his children. (May 2, 2001, Tr. p. 101). Appellant-Father noted that he paid for his son to take karate lessons and play t-ball and that he, and he alone, purchased his children's clothes, food, and medicine, with no contribution from Appellee-Mother. (May 2, 2001, Tr. pp. 79-83).
 {¶ 14} Appellant-Father admitted that he had no complaint with respect to the quality of the daycare Appellee-Mother had arranged. (May 2, 2001, Tr. p. 63). Nevertheless, he believed that he had found a less expensive option at least for the summer of 2001. Because the teenage neighbor was willing to watch all three of the children far less expensively, he saw Appellee-Mother's arrangement as overpriced and unnecessary.
 {¶ 15} Appellant-Father also objected to any reallocation of the tax dependency exemptions, claiming that reallocation would not be in the children's best interests. Appellant-Father maintained that he used the exemption money exclusively for the children, but that if Appellee-Mother received it, she would spend all of it on herself.
 {¶ 16} On May 22, 2001, the magistrate issued a detailed decision, recommending that the court increase Appellant-Father's child support obligation to $1,238.11 monthly and allow Appellee-Mother to claim one of the children under the tax dependency exemption. In so finding, the magistrate stated as follows:
 {¶ 17} "The court did not consider the additional expenses submitted by the father as those expenses were not incurred for the children or in connection with their care. The $500.00 loan payment which he is not yet making was incurred as a result of the fact that he claimed he needed to file bankruptcy post divorce and he did not consider selling his Corvette in order to avoid bankruptcy. He further pays $400.00 a month for the Corvette, which he is not able to transport the children in. The court also did not allow the $80.00 a month which the father claims he paid for childcare as there was no proof he actually bore these expenses since he indicated the childcare was only if he was required to work overtime and there was no showing he had worked any overtime within the last year to need that expense." (Magistrate's Decision and Judgment Entry, May 22, 2001, p. 2).
 {¶ 18} The trial court overruled the parties' respective objections to the Magistrate's Decision. In an order entered on August 23, 2001, the trial court adopted the decision in full.
 {¶ 19} On September 20, 2001, Appellant-Father filed his notice of appeal from that decision and on September 28, 2001 Appellee-Mother filed a notice of intent to submit a cross-appeal.
 {¶ 20} While the appeal was pending, the parties continued filing motions in the trial court. The acrimony between the parties steadily intensified, and the trial court filed an order directing the entire family to begin counseling. The court appointed a guardian ad litem to represent the children and essentially stayed all proceedings in the Court of Common Pleas. The trial court directed the parties to attend parenting classes and participate in, "at least three mediation sessions of no less than one hour per session as arranged by the mediator."
 {¶ 21} This Court received notification of the trial court's order and held the appeal in abeyance throughout the mediation process. (Journal Entry, Feb. 14, 2002). Apparently unable to resolve their dispute, the parties returned to this Court's jurisdiction.
 {¶ 22} In his first assignment of error Appellant-Father asserts as follows:
 {¶ 23} "The Trial Court Erred And Abused Its Discretion By Failing To Submit The Issue Of Modification Of Child Support To Mediation Pursuant To The Parties' Separation Agreement."
 {¶ 24} According to Appellant-Father, the separation agreement attached to the divorce decree is, like any other contract, an agreement that binds the parties to its express terms. Under paragraph M of the shared parenting plan included in the agreement the parties were to attempt mediation of any dispute concerning the shared parenting agreement or issues surrounding the couple's children before returning to the trial court. Appellant-Father insists that by going directly to the trial court with her motion, Appellee-Mother violated the agreement's terms and that, rather than entertaining the issue, the trial court should have granted his motion requesting that the court hold Appellee-Mother in contempt. During oral argument, Appellant-Father attempted to argue that the magistrate and the trial court had no jurisdiction to hear Appellee-Mother's motions because mediation was not first attempted and thus, the orders are void or voidable.
 {¶ 25} It is certainly true that a separation agreement is a contract and courts generally have no authority to rewrite or otherwise construe unambiguous terms contained within a contract. Forstner v.Forstner (1990), 68 Ohio App.3d 367, 372, 588 N.E.2d 285. It is also true that Appellee-Mother filed her motion directly to the trial court and appears to have violated this section of the agreement. Based on the record herein, however, we find nothing erroneous about the trial court's handling of the matter.
 {¶ 26} Appellant-Father's argument fails in three respects.
 {¶ 27} We note, here, that the language upon which Appellant-Father relies is not as clear and unambiguous as he claims. While the language does state that "any disagreement" regarding the "child" "will be" mediated prior to court action, this language is very broad and all encompassing. The language disregards R.C. § 3105.65(B), which empowers the trial court with continuing jurisdiction over issues in the divorce decree surrounding parental rights and responsibilities, including child support, for purposes of modifying or enforcing those provisions during the child's minority. See, accord, Eden v. Eden, 9th Dist. No. 02CA8077, 2003-Ohio-356; and Obracay v. Obracay, 8th Dist. No. 80025, 2002-Ohio-13. Such explicit direction from the General Assembly necessarily supersedes any contrary provision in the parties' separation agreement. The trial court, and by extension the magistrate, were well within their statutory authority to entertain Appellee-Mother's motion.
 {¶ 28} In essence, by asking this Court to void the magistrate's decision, Appellant-Father has requested that we enforce a provision that appears to be in contravention of state law if read as broadly as Appellant-Father urges. Courts of law and equity do not enforce contractual obligations that are illegal. Buoscio v. Lord (Dec. 17, 1999), 7th Dist. No. 98-CA-151; citing, Langer v. Langer (1997),123 Ohio App.3d 348, 354, 704 N.E.2d 275 (additional citations omitted). Parties to a dispute cannot simply agree to divest the trial court of jurisdiction explicitly granted it by the legislature. Any provision that attempts to do so is invalid and unenforceable.
 {¶ 29} Second, even if the separation agreement provision requiring mediation first were both clear and clearly valid, the trial court was well within its discretion to deny Appellant-Father's motion for contempt. Under R.C. § 2705.02, contempt is proper in the following circumstances:
 {¶ 30} "(A) Disobedience of, or resistance to, a lawful writ, process, order, rule, judgment, or command of a court or officer;
 {¶ 31} "(B) Misbehavior of an officer of the court in the performance of official duties, or in official transactions;
 {¶ 32} "(C) A failure to obey a subpoena duly served, or a refusal to be sworn or to answer as a witness, when lawfully required;
 {¶ 33} "(D) The rescue, or attempted rescue, of a person or of property in the custody of an officer by virtue of an order or process of court held by the officer;
 {¶ 34} "(E) A failure upon the part of a person recognized to appear as a witness in a court to appear in compliance with the terms of the person's recognizance;
 {¶ 35} "(F) A failure to comply with an order issued pursuant to section 3109.19 or 3111.81 of the Revised Code;
 {¶ 36} "(G) A failure to obey a subpoena issued by the department of job and family services or a child support enforcement agency pursuant to section 5101.37 of the Revised Code;
 {¶ 37} "(H) A willful failure to submit to genetic testing, or a willful failure to submit a child to genetic testing, as required by an order for genetic testing issued under section 3111.41 of the Revised Code."
 {¶ 38} Contempt results when a party before a court disregards or disobeys an order or command of judicial authority. First Bank ofMarietta v. Mascrete, Inc. (1998), 125 Ohio App.3d 257, 263,708 N.E.2d 262. Contempt of court may also involve an act or omission substantially disrupting the judicial process in a particular case. In reDavis (1991), 77 Ohio App.3d 257, 262, 602 N.E.2d 270. The law surrounding contempt was created to uphold and ensure the effective administration of justice, secure the dignity of the court, and affirm the supremacy of law. Cramer v. Petrie (1994), 70 Ohio St.3d 131, 133,637 N.E.2d 882, 884-885.
 {¶ 39} Separation agreements incorporated into the divorce decree such as the one at issue here have the same effect as an order of court and may be enforced through contempt proceedings. Kracht v. Kracht (April 18, 1996), 8th Dist. Nos. 68218, 68985; citing Wolfe v. Wolfe (1976),46 Ohio St.2d 399, 417-418, 350 N.E.2d 413.
 {¶ 40} A court has inherent as well as statutory authority to punish a party for contempt. Zakany v. Zakany (1984), 9 Ohio St.3d 192,459 N.E.2d 870. When reviewing a finding of contempt, an appellate court must apply an abuse of discretion standard. In re Contempt of Morris
(1996), 110 Ohio App.3d 475, 479, 674 N.E.2d 761; citing, Dozer v. Dozer
(1993), 88 Ohio App.3d 296, 623 N.E.2d 1272. An abuse of discretion connotes more than an error of law or judgment; implies that the trial court's attitude is unreasonable, arbitrary or unconscionable. Blakemorev. Blakemore (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.
 {¶ 41} When it agreed with the magistrate's refusal to issue a contempt citation or to send the child support issue to mediation, the trial court noted that,
 {¶ 42} "Mediation is an effort by a neutral party to have the parties discuss a problem and agree to a resolution. In the appropriate situation child support could be submitted to mediation and should be if an agreement is made by the parties to submit child support to mediation. The issue before this Court is whether the Magistrate should have at the outset of the filing of the motion to modify support ordered the case to mediation or find the Plaintiff in contempt for failure to mediate the matter, at this stage in the proceedings, given the subsequent motion by the Plaintiff to set aside the origin (sic) decision in to this matter, such efforts are probably futile and not in the best interests of the children which is of course, the polestar of any Court's decision concerning parenting, parenting time and support." (Opinion and Judgment Entry, Aug. 23, 2001).
 {¶ 43} There is nothing unreasonable about this decision. Undoubtedly, a trial court may exercise its powers of contempt to punish any party over whom it has jurisdiction by virtue of the original divorce decree when that party violates the decree. Hughes v. Hughes (1991),72 Ohio App.3d 286, 594 N.E.2d 653. This power rests exclusively with the trial court, however. The trial court is in the best position to determine how to fairly administer and enforce its own orders. Appellant-Father's argument implies that the trial court must undertake contempt proceedings whenever one party complains that another party has violated a court order. Appellant-Father supplies no authority for such a notion and this Court is not aware of any such law.
 {¶ 44} Third, and lastly, even if the trial court had granted Appellant-Father's motion for contempt, this decision would not have provided him the remedy he now seeks. In his motion, Appellant-Father asked the court to impose, "all the appropriate penalties, including awarding him attorneys fees and costs associated with this action and any other relief that this Court deems equitable and just under the circumstances." (Motion for Contempt, March 20, 2001). Specifically, this Court has been asked to void the trial court's orders.
 {¶ 45} Contempt has been classified as direct or indirect. Direct contempt occurs in the presence of the court in its judicial function. R.C. § 2705.01. Indirect contempt involves behavior that occurs outside the presence of the court demonstrating a lack of respect for the court or its lawful orders. State v. Drake (1991), 73 Ohio App.3d 640,643, 598 N.E.2d 115. The distinction between contempt that is civil in nature from that which is criminal depends upon the character and purpose of the punishment imposed. State ex rel. Johnson v. Perry County Court
(1986), 25 Ohio St.3d 53, 55, 495 N.E.2d 16.
 {¶ 46} Civil contempt is remedial or coercive in nature and will be imposed to benefit the complainant. Delawder v. Dodson , 4th Dist. No. 02CA27, 2003-Ohio-2092. P9; citing, Pugh v. Pugh (1984),15 Ohio St.3d 136, 139, 472 N.E.2d 1085; and Carrol v. Petty (1996)113 Ohio App.3d 708, 711, 681 N.E.2d 1383. In contrast, courts impose criminal contempt in order to punish the contemnor, thus, its primary characteristic is in an unconditional prison term or fine. Id. The burden of proof for civil contempt is clear and convincing evidence, while proof beyond a reasonable doubt must be presented to impose criminal contempt.Delawder, supra at P10. Normally, contempt proceedings in domestic relations matters are civil in nature because their purpose is to coerce or encourage future compliance with the court's orders. Evans v. Cole
(June 11, 2001), 4th Dist. No. 00CA17. Declaring the orders in this matter to be void would further neither of these goals.
 {¶ 47} Under R.C. 2705.05(A), the appropriate sanctions available for a finding of contempt include a fine of not more than $250 and/or imprisonment of not more than thirty days in jail (first offense), a fine of not more than $500 and/or imprisonment of not more than sixty days in jail (second offense), or a fine of not more than $1,000 and/or imprisonment of not more than ninety days in jail (third or greater offense). See Felton v. Felton (1997), 79 Ohio St.3d 34, 38-39,679 N.E.2d 672.
 {¶ 48} The court may also direct the contemnor to pay costs and the complaining party's attorneys fees. In re Contemnor Caron (2000),110 Ohio Misc.2d 58, 744 N.E.2d 787. These are the remedies available in the event the trial court determines that a contempt citation is proper. The remedy that Appellant-Father seeks, voiding the magistrate's order, is not among them. Even if such a remedy, however tenuous, were possible, it is not available here because by asking the trial court to hold Appellee-Mother in contempt, Appellant-Father implicitly accepts that the trial court had and has jurisdiction over the matter. If the court has jurisdiction over the parties to find contempt, it certainly has jurisdiction to interpret and enforce the support orders at issue here.
 {¶ 49} We note that ultimately the trial court did send the matter, including the issue of child support, to mediation. Presumably, had the parties managed to resolve some of their differences, the trial court could have revised the orders at issue, here, perhaps more favorably to Appellant-Father, during or following this mediation. Essentially, Appellant-Father has obtained the remedy he originally sought, though certainly not in the manner he wished.
 {¶ 50} The trial court did not err in denying Appellant-Father's motion for contempt. The provision in the separation agreement on which he relies, if read as broadly as Appellant-Father urges, cannot be used to divest the trial court of jurisdiction that the legislature has first placed in the court. The trial court was not required to find Appellee-Mother in contempt, here. Even if the court had cited Appellant-Mother for contempt, such a decision would not have voided the magistrate's order or gotten Appellant-Father the relief he now seeks. Consequently, Appellant-Father's first assignment of error is overruled.
 {¶ 51} In his second assignment of error, Appellant-Father maintains:
 {¶ 52} "The Trial Court Erred By Failing To Modify Appellant's Child Support Obligation Because Of The Extraordinary, Reasonable And Necessary Expenses The Appellant Maintains."
 {¶ 53} This assignment of error somewhat misstates the substance of Appellant-Father's own argument. Essentially, he contends that the "uncontroverted evidence" shows he could not afford to pay the increase in child support ordered by the court. Appellant-Father maintains that because of his, "extraordinary, reasonable and necessary expenses," the trial court should not have allowed the requested increase. Based on the evidence of record, we must disagree with this contention.
 {¶ 54} Initially, we note that Appellant-Father's use of the term "uncontroverted" to characterize the evidence demonstrating those "necessary" expenses is considerably overplayed given the record. That said, the magistrate heard the testimony, weighed the evidence and concluded that the increase in support was needed and that Appellant-Father could afford to pay the increase. The trial court agreed with this finding.
 {¶ 55} The trial court's decisions pertaining to child support are discretionary and will not be disturbed absent an abuse of that discretion. Booth v. Booth (1989), 44 Ohio St.3d 142, 144, 686 N.E.2d 1108. In order to find that the trial court abused its discretion, this Court must conclude that the decision of the trial court was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment.Blakemore, supra. In subjecting trial court decisions to review under this standard, this Court must initially presume the lower court's findings are correct. Miller v. Miller (1988), 37 Ohio St.3d 71, 74,523 N.E.2d 846.
 {¶ 56} Under R.C. 3119.22, the trial court may deviate from the statutory child support work sheet where the amount calculated thereunder, "would be unjust or inappropriate and would not be in the best interest of the child[ren]." R.C. 3119.23 states:
 {¶ 57} "The court may consider any of the following factors in determining whether to grant a deviation pursuant to section 3119.22 of the Revised Code:
 {¶ 58} "(A) Special and unusual needs of the children;
 {¶ 59} "(B) Extraordinary obligations for minor children or obligations for handicapped children who are not stepchildren and who are not offspring from the marriage or relationship that is the basis of the immediate child support determination;
 {¶ 60} "(C) Other court-ordered payments;
 {¶ 61} "(D) Extended parenting time or extraordinary costs associated with parenting time, provided that this division does not authorize and shall not be construed as authorizing any deviation from the schedule and the applicable worksheet, through the line establishing the actual annual obligation, or any escrowing, impoundment, or withholding of child support because of a denial of or interference with a right of parenting time granted by court order;
 {¶ 62} "(E) The obligor obtaining additional employment after a child support order is issued in order to support a second family;
 {¶ 63} "(F) The financial resources and the earning ability of the child;
 {¶ 64} "(G) Disparity in income between parties or households;
 {¶ 65} "(H) Benefits that either parent receives from remarriage or sharing living expenses with another person;
 {¶ 66} "(I) The amount of federal, state, and local taxes actually paid or estimated to be paid by a parent or both of the parents;
 {¶ 67} "(J) Significant in-kind contributions from a parent, including, but not limited to, direct payment for lessons, sports equipment, schooling, or clothing;
 {¶ 68} "(K) The relative financial resources, other assets and resources, and needs of each parent;
 {¶ 69} "(L) The standard of living and circumstances of each parent and the standard of living the child would have enjoyed had the marriage continued or had the parents been married;
 {¶ 70} "(M) The physical and emotional condition and needs of the child;
 {¶ 71} "(N) The need and capacity of the child for an education and the educational opportunities that would have been available to the child had the circumstances requiring a court order for support not arisen;
 {¶ 72} "(O) The responsibility of each parent for the support of others;
 {¶ 73} "(P) Any other relevant factor.
 {¶ 74} "* * *
 {¶ 75} "If the court grants a deviation based on division (P) of this section, it shall specifically state in the order the facts that are the basis for the deviation."
 {¶ 76} Appellant-Father argues that he has been forced to incur numerous expenses, which are necessary, work-related and/or incurred in the best interests of the children. Appellant-Father contends that underKamm v. Kamm (1993), 67 Ohio St.3d 174, 541 N.E.2d 1028, he should be able to reduce his overall income by deducting the ordinary and necessary expenses of running his business.
 {¶ 77} In Kamm, supra, the Court held that where the child support obligor is self-employed, he may be able to deduct the purchase of a depreciable capital asset against his gross income, provided the acquisition of the asset is both "ordinary and necessary" as defined under the law existing at the time. Id. at 177-178. The Court concluded that a farmer's purchase of a new tractor was probably an ordinary and necessary expense. The Court also noted, however, that the farmer's purchase of a computer system, while arguably helpful in the managing the farm's operations, might not be ordinary and necessary under all financial circumstances. Id. at 177. Accordingly, the Court concluded that each case turned on its own facts and that the best interests of the children involved remained the "paramount consideration." Id. at 178.
 {¶ 78} R.C. 3119.01(C)(9)(a) defines ordinary and necessary expenses as, "actual cash items expended by the parent or the parent's business and includes depreciation expenses of business equipment as shown on the books of a business entity." According to Appellant-Father, his necessary work-related expenses amount to $80 per month for automobile repair tools and the purchase of an additional personal use vehicle (a two seat Corvette) at the cost of $400 per month. Appellant-Father also claims that his support payments should have been offset by the approximately $250 he pays per month for gasoline to travel to and from work each day. With respect to expenditures made in the best interests of his children, Appellant-Father maintains that he alone provides adequate food, clothing and medicine and he is solely responsible for funding their extracurricular activities.
 {¶ 79} Both the magistrate's recommendations and the trial court's decision adopting these recommendations reflect that some of these expenses were considered and some were not. The magistrate's order indicates that she did account for the $80.00 monthly that Appellant-Father spent on tools. However, the magistrate refused to consider a number of the expenses Appellant-Father claims:
 {¶ 80} "The court did not consider the additional expenses submitted by the father as those expenses were not incurred for the children or in connection with their care. The $500.00 loan payment which he is not yet making was incurred as a result of the fact that he claimed he needed to file bankruptcy post divorce and he did not consider selling his Corvette in order to avoid bankruptcy. He further pays $400.00 a month for the Corvette, which he is not able to transport the children in. The court also did not allow the $80.00 a month which the father claims he paid for childcare as there was no proof he actually bore these expenses since he indicated the childcare was only if he was required to work overtime and there was no showing he had worked any overtime within the last year to need that expense." (Magistrate's Decision and Judgment Entry, May 22, 2001, p. 2).
 {¶ 81} The magistrate's order omits any discussion concerning Appellant-Father's assertion that he alone paid for the children's food, clothing, medicine and extracurricular activities. That omission undoubtedly reflects that she, like the trial court, chose to disregard these wholly unsubstantiated claims. As the trial court reasoned, "[h]er non-inclusion of those things in her consideration indicates to the Court that either she did not find the Defendant credible or that she did not consider these things `extraordinary.'" (Opinion and Judgment Entry, August 23, 2001, p. 4). Such a conclusion is not unreasonable given the record of proceedings. At the hearing before the magistrate, Appellant-Father complained rather heatedly about what he saw as Appellee-Mother's failure to provide for the couple's children. Lacking evidentiary support, however, such testimony hardly amounts to "uncontroverted" proof. More importantly, the magistrate, who saw and heard the witnesses as they testified, apparently did not find many of his claims to be credible.
 {¶ 82} This Court will not overturn the credibility determinations reached by the trial court. Such conclusions are generally reached, "through contact with and observation of the parties and through independent investigation can not be conveyed to a reviewing court by the printed record." Sallee v. Sallee (2001), 142 Ohio App.3d 366, 370,755 N.E.2d 941; citing, Bechtol v. Bechtol (1990), 49 Ohio St.3d 21, 23,550 N.E.2d 178; and quoting, Trickey v. Trickey (1952), 158 Ohio St. 9,13, 106 N.E.2d 772.
 {¶ 83} Consequently, this assignment of error is also overruled.
 {¶ 84} In his third assignment of error, Appellant argues:
 {¶ 85} "The Trial Court Erred By Ordering One Of The Parties Three Tax Exemptions To Appellee By Ignoring The Evidence That Each Exemption Will Be Of Greater Value To Appellant."
 {¶ 86} Appellant-Father claims that the trial court's decision to reallocate the child dependency tax exemptions so that Appellee-Mother could claim one of the children was contrary to the manifest weight of the evidence. Appellant-Father further complains that under the Ohio Supreme Court's holding in Hughes v. Hughes (1988), 35 Ohio St.3d 165,518 N.E.2d 1213, the trial court had no jurisdiction to reallocate the dependency exemption once they were awarded to him. Again, we must disagree with Appellant-Father's assertions.
 {¶ 87} Appellant-Father misconstrues the decision in Hughes. Nothing in that case bars the trial court from modifying the allocation of the tax dependency exemptions based on changes in the circumstances of the parties, as long as such a modification inures to the benefit of the children. See also, Walchli v. Walchli (Aug.11, 1995), 6th Dist. No. E-94-069. In Hughes, the Court simply held that Title26 U.S.C. § 152(e), creating a presumption in favor of awarding tax dependency exemptions to the custodial parent, did not bar the state court from awarding such exemptions to non-custodial parents. Id. at 168; see, also, Singer v. Dickinson (1992), 63 Ohio St.3d 408,588 N.E.2d 806. Since custody appears to have been awarded jointly in this case, the controversy the court addressed in Hughes is not present before us.
 {¶ 88} As we noted when we overruled Appellant-Father's first assignment of error, under R.C. 3105.65(B), the trial court retains jurisdiction to modify all matters pertaining to the care of the parties' children. Specifically, the Revised Code establishes in relevant part that,
 {¶ 89} "The court has full power to enforce its decree and retains jurisdiction to modify all matters pertaining to the allocation of parental rights and responsibilities for the care of the children, to the designation of a residential parent and legal custodian of the children, to child support, to parenting time of parents with the children, and to visitation for persons who are not the children's parents." R.C. 3105.65(B) (emphasis applied).
 {¶ 90} The allocation of dependent child tax exemptions is unequivocally an issue pertaining to the parental rights and responsibilities. A trial court's decision with respect to the allocation of tax dependency exemptions is reviewed for an abuse of discretion.Detling v. Stottler (Sept. 22, 1999), 7th Dist. No. 96-BA-15; citingBooth, supra at 144. The highly deferential abuse of discretion standard, does not permit this Court to substitute its judgment for that of the trial court. Berk v. Matthews (1990), 53 Ohio St.3d 161, 169,559 N.E.2d 1301; and Buckles v. Buckles (1988), 46 Ohio App.3d 102,546 N.E.2d 950.
 {¶ 91} When determining which parent may claim any one or all of the children as dependents for purposes of the income tax exemptions, the trial court applies a "best interest of the child" test. See, Hurchanikv. Hurchanik (1996), 110 Ohio App.3d 628, 631, 674 N.E.2d 1260;Hutchinson v. Hutchinson (1993), 85 Ohio App.3d 173, 176, 619 N.E.2d 466; and Bobo v. Jewell (1988), 38 Ohio St.3d 330, 332, 528 N.E.2d 180.
 {¶ 92} The record reflects that when the parties initially separated, Appellant-Father reported an adjusted gross income of $59,400, while Appellee-Mother earned $10,811. The separation agreement the parties originally entered indicated agreement that Appellant-Father should claim all three children as dependents because Appellee-Mother was not gainfully employed at the time. (Appellant-Father's Brf. Exh. A, p. 3). At the hearing on Appellee-Mother's request to modify the support order approximately three years later, however, it was clear that Appellee-Mother's circumstances had changed considerably. Appellee-Mother testified that she had completed her education and taken a full-time position as a software engineer at a company located one hour away in Wexford, Pennsylvania. At the time of hearing, she earned $35,000 annually. (May 2, 2001, Tr. pp. 7-10). Appellant-Father testified that he earned approximately $72,000 at the time of hearing.
 {¶ 93} Based on the increase in Appellee-Mother's taxable income, and the fact that Appellee-Mother earns about half of what Appellant-Father earns, the magistrate recommended that the trial court award Appellee-Mother the right to claim one of her children as dependent under the tax exemption. The trial court agreed, finding as follows:
 {¶ 94} "If the Defendant received all three exemptions he would get $4,156.00 tax advantage. The exemptions are divided as the Magistrate determined, he gets $2,771.00 benefit and the Plaintiff who makes half of the income he makes will get $1,001.00 benefit. Obviously this $1,000.00 on her income of $35,000.00 is equal to the $2,771.00 on his income. This leaves both parties with extra income to help the children and certainly was not an abuse of discretion." (Judgment Entry, August 23, 2001, p. 4).
 {¶ 95} Consequently, the trial court reallocated one of the couple's child tax exemptions from Appellant-Father, who had originally been allowed to claim all three children, to Appellee-Mother. Appellant-Father's claims to the contrary, there is nothing unreasonable or arbitrary about that decision given the record before us and this assignment of error, as well, is overruled.
 {¶ 96} Appellee-Mother has filed a cross appeal in which she alleges as follows:
 {¶ 97} "The Trial Court Erred In Setting Appellant's Income Lower Than His Actual Earnings"
 {¶ 98} Appellee-Mother contends that the trial court's conclusion that Appellant-Father's annual income was $64,690 was erroneous under R.C. 3119.05. According to Appellee-Mother, Appellant-Father's income is actually $68,407 or $68,271.50 (depending on the math used) and she asks this Court to modify the trial court's order to reflect one of these two figures. It appears from the relevant law that Appellee-Mother is right in her assertions.
 {¶ 99} The trial court calculates a parent's gross income for purposes of assessing the proper amount of child support to order in accordance with R.C. 3119.05(D). Under that provision, when the trial court must, "include the lesser of the following as income from overtime and bonuses:
 {¶ 100} "(1) The yearly average of all overtime, commissions, and bonuses received during the three years immediately prior to the time when the person's child support obligation is being computed;
 {¶ 101} "(2) The total overtime, commissions, and bonuses received during the year immediately prior to the time when the person's child support obligation is being computed." (R.C. 3119.05[D]).
 {¶ 102} The magistrate concluded that Appellant-Father received a regular income of $31,200 annually plus average overtime and bonuses in the amount of $33,370.67. His projected bonus for the year 2001 was $30,903 and his income from interest and dividends was $187. (Magistrate's Decision and Judgment Entry, May 22, 2001, p. 1). From these figures, the magistrate found that Appellant-Father had an adjusted gross income of $64,690.
 {¶ 103} Appellee-Mother complains that the magistrate's figures were not calculated in accordance with R.C. 3119.05(D). Factual determinations underlying decisions concerning child support are reviewed for an abuse of discretion. Mallin v. Mallin (1995), 102 Ohio App.3d 717,722, 657 N.E.2d 856 (citations omitted).
 {¶ 104} Appellant-Father's tax returns and pay stubs documented his earnings during the four years preceding the hearing as follows: 1998 — $67,865; 1999 — $65,861; 2000 — $72,457; and his projected income for 2001 — $66,903. (May 2, 2001, Tr. pp. 61-62, 75-76). Appellee-Mother argues correctly that based on these figures, Appellant-Father's average total wages for the three years prior to hearing was $68,407 and the average for the preceding four years was $68,271.50. In light of R.C. 3119.05(D)(1), requiring to the trial court to calculate income based on the average income earned during the three years immediately prior to the time when the support is calculated, the trial court should have found that Appellant-Father's average income was $68,727, for the years 1998-2000. The alternative calculation under R.C. § 3119.05(D)(2) is $72,457 for the year 2000. Since $68,727 is the lesser figure, Appellant-Father's income should have been assessed at that amount.
 {¶ 105} In light of the magistrate's miscalculation, Appellee-Mother's cross-appeal has merit and this Court hereby modifies the trial court's order to reflect our recalculation in accordance with R.C. 3119.05(D). Because we must overrule the assignments of error raised in Appellant-Father's appeal in their entirely, the judgment entered by the Columbiana County Court of Common Please is otherwise affirmed.
Vukovich, J., concurs.
DeGenaro, J., concurs in judgment only; see concurring in judgment only opinion.